## GREAT NORTHERN RY. CO. v. UNITED STATES et al.

Civ. No. 1141.

United States District Court
D. Delaware.

Dec. 27, 1948.

Edwin C. Matthias, Reuben J. Hagman, and Louis E. Torinus, Jr., all of St. Paul, Minn., Clarence A. Southerland, David F. Anderson, William Poole and Southerland, Berl & Potter, of Wilmington, Del., for petitioner.

Edward Dumbauld and William J. Hickey, Sp. Assts. to the Atty. Gen. and Herbert A. Bergson, Asst. Atty. Gen., and William Marvel, U. S. Atty., of Wilmington, Del. for defendant.

J. Stanley Payne, Asst. Chief Counsel, Interstate Commerce Commission and Daniel W. Knowlton, Chief Counsel, Interstate Commerce Commission, both of Washington, D. C., for intervening defendant Interstate Commerce Commission.

S. J. Wettrick and Floyd F. Shields, both of Chicago, Ill. and Robert H. Richards, Jr. (of Richards, Layton & Finger) of Wilmington, Del., for intervening defendants General Mills, Inc. and Montana Flour Mills Co.

Before BIGGS, Circuit Judge, LEAHY, Chief Judge, and RODNEY, District Judge.

RODNEY, District Judge.

This is an action to restrain the enforcement of an order made by the Interstate Commerce Commission. The case was based upon the following facts: In March, 1946 General Mills, Inc., a corporation of the State of Delaware, instituted certain proceedings before the Interstate Commerce Commission against Great Northern

Railway Company, a corporation of the State of Minnesota. Montana Flour Mills Company intervened in such proceedings in support of the complaint. The foregoing proceedings culminated in an order of the Commission dated December 18, 1947.[1] The order, as originally made, concerned rates for the transportation of grain or grain products from points in Central Montana to points, inter alia, in California. The order required that such rates should apply to grain or grain products routed through Butte, Montana when milled or stored in transit at Great Falls, Montana and required that such rates should not exceed existing joint rates from and to the same points over the same route on shipments of similar commodities not stopped in transit. The order of the Commission was revised and amended on July 7, 1948 to apply to "wheat and wheat products" instead of "grain and grain products" and was restricted to transportation from points "in the triangle territory in central Montana" rather than "from points in central Montana."

The present action is brought by Great Northern Railway Company against the United States of America seeking to annul and set aside the order of the Interstate Commerce Commission. The Interstate Commerce Commission, General Mills, Inc., and Montana Flour Mills Company have intervened as parties defendant.

The facts surrounding this case are elaborately set out in the opinion of the Commission (269 I.C.C. 457). Only such facts as may be necessary to a general understanding of the present question are here repeated and as succinctly as possible.

There is a territory in central Montana known as the Montana triangle which is serviced by the lines of the plaintiff company. This area is embraced within a rough or general inverted triangle with the apex at Great Falls, Montana, and the base being a line from Havre on the East and Shelby on the West. Within this general area there is grown a superior kind of hard spring wheat specially desirable for certain purposes because of its high protein content. There is a large market for flour from this wheat in the California market, and mills at Great Falls, Ogden, Utah and other places are in keen competition for that market. There are two all-rail routes from the Montana triangle to California, one being a long route through Seattle and Portland and the other a shorter route through Butte, Pocatello and Ogden. Originally the all-rail rates on grain did not apply to the shorter route through Butte, but only on the route through Seattle and Portland. This arrangement was to enable the originating lines to procure the benefit of a long haul. These rates and routes were considered by the Commission in the elaborate and comprehensive investigation known as "Grain and Grain Products," 205 I.C.C. 301. It was there determined that the joint rates should apply to the route through Butte as well as that through Seattle and Portland (205 I.C.C. 301 at 449). This rate was 65 cents per hundred pounds, which amount was subsequently, in 1938, raised to 68 cents. It was also determined that two free transits or stop-overs should be allowed. It is around this term "transit," with its meaning and implications, that most of the present questions cluster.

A transit privilege, usually called a "transit", has been explained by the Supreme Court in Board of Trade of Kansas City v. United States, 314 U.S. 534, 537, 62 S.Ct. 366, 368, 86 L.Ed. 432, as a privilege which "enables grain to be shipped from point A to point B, there to be stored, marketed, or processed, and later reshipped to point C at a rate less than the combination of the separate rates from A to B and B to C. * * * The shipper pays the local rate on the inbound shipment to the transit point, B in our illustration. A receipted freight bill specifying the point of origin, the rate paid, and other pertinent data, is recorded with the transit bureau as evidence of intention of further transportation of the inbound grain or its equivalent. When the outbound shipment is tendered to the carrier, the freight bill is surrendered in order that the shipper may obtain an outbound rate lower than that which he would otherwise be com-

---

[1] 269 I.C.C. 457.

pelled to pay. The privilege belongs, as it were, to both the grain and its shipper."

General Mills, which instituted the proceedings before the Commission, has a large flour mill at Great Falls, Montana with a daily capacity of 2,600 hundred weight of flour and, in connection with that mill, has a grain elevator with a storage capacity of 1,566,000 bushels of grain. It has also 15 other elevators in the triangle district with a combined storage capacity of 438,000 bushels.

After the same rate was established for grain moving from Montana to California by way of Butte as was applied to grain moving over the route through Spokane, Seattle or Portland, certain transit points were established at Ogden and other points on the Butte route. The Great Northern has maintained a transit point at Great Falls for wheat or wheat products moving to California by way of Seattle and Portland, but has not permitted transit at Great Falls for wheat or wheat products moving to California by way of Butte. Great Falls is intermediate from many points of the Montana triangle to Seattle and Portland and is intermediate from all points of the triangle to Butte. Great Falls, is, however, not intermediate to Seattle for all points in the triangle and as to these points there is involved an out-of-line haul to Great Falls. This out-of-line haul required on shipments transited at Great Falls and routed through Portland and Seattle necessitates a charge of from 2 to 5 cents in addition to the fixed rate of 68 cents, while a shipment milled at Great Falls and reshipped to California via Butte without application of the present joint rates results in an additional charge up to 22 cents. It has been found by the Commission that a differential of 2 cents at the California market means the loss of competition.

It is in evidence that, due to climatic or other conditions, the hard spring wheat formerly obtainable in the southern segments of the Montana triangle is now only obtainable in more northerly portions where Great Falls is not intermediate on the route through Seattle and Portland. This, of course, must result in increasing out-of-line hauls where wheat is transited at Great Falls and routed through Seattle and Portland.

Great Northern opposed the establishment of a transit point at Great Falls for shipments by way of Butte because, as it contended, it would be deprived of the benefit of the longer haul by way of Seattle and Portland and have substituted therefor the comparatively short haul to Butte with the transit expenses applicable to either route. Great Northern contended the route through the Western Gateway via Seattle and Portland was not unreasonably long and, indeed, no such contention was made by any of the parties and the Commission made no finding on such basis.

The petitioner contends that the order of the Commission creates a new through route from the Montana triangle to California via Butte and would result in short-hauling the petitioner without its consent and that the order of the Commission was not based upon jurisdictional findings required by Section 15(3) and 15(4) of the Interstate Commerce Act. The relevant portions of these sections appear in footnote.[2]

---

[2] 49 U.S.C.A. § 15(3): "The Commission may, and it shall whenever deemed by it to be necessary or desirable in the public interest, after full hearing upon complaint or upon its own initiative without complaint, establish through routes * * *."

49 U.S.C.A. § 15(4): "In establishing any such through route the Commission shall not * * * require any carrier by railroad, without its consent, to embrace in such route substantially less than the entire length of its railroad and of any intermediate railroad operated in conjunction and under a common management or control therewith, which lies between the termini of such proposed through route, (a) unless such inclusion of lines would make the through route unreasonably long as compared with another practicable through route which could otherwise be established, or (b) unless the Commission finds that the through route proposed to be established is needed in order to provide adequate, and more efficient or more economic transportation: Provided, however, That in prescribing through routes the Commission shall, so far as is consistent with the public interest, and subject to the foregoing limitations in clauses (a) and (b), give reasonable preference to the carrier by railroad which originates the traffic. * * * *"

924

The basic issue between the parties appears at this point. The petitioner contends that the order of the Commission establishes a new through route from the Montana triangle to California through Butte where the transit occurs at Great Falls. The petitioner contends that this new through route can only be established upon compliance with the provisions of Section 15(3) and, since this new through route would require the petitioner to forego an existing long haul, the new through route must comply with the provisions of Section 15(4). The United States, and the interveners, contend that the through route via Butte is already established and is unavailable to shippers only because of the failure of Great Northern to allow transit at Great Falls in the same manner as it permits in respect to transit points south of Butte.

The defendant, and interveners, contend that since through routes and joint rates are available for shipments from the triangle to California via Butte when transit is at points south of Butte, the requirement of the Commission that transit be allowed at Great Falls is merely an incidental action necessary to the operation of an existing through route and the general adjustment of rates on grain, and that this requirement of transit at Great Falls may be ordered by the Commission under Sections 1(5), 1(6) and 3(1).[3]

■ A "through route" is an arrrangement, express or implied, between connecting railroads for the continuous carriage of goods from the originating point on the line of one carrier to the destination on the line of another. In determining the existence of a through route, all of the circumstances connected with the shipments from place to place may be taken into account.[4]

■ The Commission has found that a through route existed from the Montana triangle to California via Butte for favored transitors south of Butte. It therefore ordered the establishment of transit privileges at Great Falls upon an existing through route and without the special findings required by Section 15(3). In this we think the Commission was correct. The order did not establish a new through route. It simply ordered the petitioner to discontinue what it termed an unreasonable practice and to make the through route and existing rates available to those entitled thereto. In Virginian R. Co., v. United States, 272 U.S. 658, 666, 47 S.Ct. 222, 71 L.Ed. 463, it was held that where through routes existed and combination rates were in effect, regulatory proceedings might be had under Sections 1 and 3 without the necessity of making the special findings under Section 15(3). The analogy and resemblance of the Virginian case and the case at bar is strong. In both cases the Commission found that through routes existed. In the Virginian case the Commission found the existing combination rates were unreasonable and discriminatory and prescribed reasonable and non-discriminatory rates. These actions were held proper under Sections 1 and 3 without the special findings re-

---

[3] 49 U.S.C.A. § 1(5): "All charges made for any service rendered * * * in the transportation of * * * property * * * shall be just and reasonable, and every unjust and unreasonable charge for such service or any part thereof is prohibited and declared to be unlawful."

49 U.S.C.A. § 1(6): "It is made the duty of all common carriers subject to the provisions of this chapter, to establish, observe, and enforce * * * just and reasonable regulations and practices affecting classifications, rates, or tariffs * * * and every unjust and unreasonable classification, regulation, and practice is prohibited and declared to be unlawful."

49 U.S.C.A. § 3(1): "It shall be unlawful for any common carrier subject to the provisions of this chapter to make, give, or cause any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic, in any respect whatsoever; or to subject any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever * * *."

[4] St. Louis Southwestern R. Co. v. United States, 245 U.S. 136, 139, 38 S. Ct. 49, 62 L.Ed. 199.

quired by Section 15(3). In the present case the existing rates were not found to be unreasonable or discriminatory. The Commission, however, found that where the facilities at Great Falls were utilized and shipments made by Butte, the failure of the carrier to establish transit privileges at Great Falls operated as a denial to the shipper of the use of such reasonable rates and resulted in the imposition of unreasonable and discriminatory rates. It has been said, "It is not the province of railroads to determine what markets shall be available to sellers or buyers, or by * * * the maintenance of rate disadvantages to restrict or circumscribe the opportunities of shippers located on other railroads to sell in markets served by them. It is their function to transport in the channels necessitated by trade conditions and not to fix limitations on commerce." D. A. Stickell & Sons, Inc. v. Alton Railroad Co., 255 I.C.C. 333, 337.

The petitioner contends that since, prior to the hearing, no transit existed at Great Falls connecting the inbound and outbound shipments at that point where the shipments were via Butte, there could be no continuous carriage there and, ergo, that there could be no through route at that point.

■ We think that a transit is an accompaniment or supplementary advantage in connection with an existing through route but does not, in itself, create the through route. The existence of a transit implies the existence of the through route. A transit at a particular point is the voluntary or required action of the particular carrier at such point, but a through route is not created by creating a transit.

■ Finally the petitioner contends that in the absence of transit at Great Falls the inbound shipment from the Montana triangle to Great Falls is intrastate and the shipment from Great Falls to California via Butte is interstate and that the Commission did not follow the procedure necessary to obtain jurisdiction in such situation. The establishment, however, of an interstate rate from the Montana triangle to California via Butte (205 I.C.C. 301) contemplated the existence of transit points where such points should be required and

such fact has been expressly found in this case. The carrier, alone, by its action in establishing a transit point cannot solely determine the application of existing intrastate and interstate rates. A transit has been determined to be an essential part and universal practice in connection with the transportation of grain. Ordinarily, it seeems that the establishment of transit privileges at particular points is left to the discretion of the carrier. When a carrier denies transit at an intermediate point along a through route and such denial operates in a manner that is unreasonable and unduly prejudicial, then we think the Commission, by Sections 1 and 3, and Section 15(1), has power to correct the discrimination and order the establishment of the transit. In Central R. Co. of New Jersey v. United States, 257 U.S. 247, 42 S.Ct. 80, 82, 66 L.Ed. 217, it is said, "The Commission clearly has power under section 1 * * * to determine whether in a particular case a transit privilege should be granted or should be withdrawn." See also Thomas Keery Co. v. N. Y. O. & W. Ry. Co., 206 I.C.C. 585; 211 I.C.C. 451; 226 I.C.C. 335.

As we view it these are the ultimate facts. For a shipment from the Montana triangle to California via the Western Gateway of Seattle and Portland and with transit privileges at Great Falls there exists a through route at a joint rate of 68 cents, subject to an out-of-line haul to Great Falls as to those points where Great Falls is not intermediate. For a shipment from the triangle to California via Butte this same joint rate of 68 cents applies where transit is had at points south of Butte. For a shipment from the triangle to California via Butte where grain is processed at Great Falls and without transit privileges there, the combination rates are as high as 90 cents. The order of the Commission gives to the processors at Great Falls the advantage of the same rates enjoyed by other transit points on the same through route south of Butte.

Findings of fact and conclusions of law are filed with this discussion. A judgment will be entered dismissing the petition in this case and an order therefor may be submitted.