**562**

SOUTHERN RAILWAY COMPANY
et al., Plaintiffs,
v.
The UNITED STATES of America
et al., Defendants.

Civ. A. No. 2432.

United States District Court
E. D. Virginia, at Richmond.

Argued Feb. 20, 1957.

Decided June 19, 1957.

Thomas B. Gay, Richmond, Va., James A. Bistline, Washington, D. C., for plaintiffs.

Victor R. Hansen, Asst. Atty. Gen., Washington, D. C., Lester S. Parsons, Jr., U. S. Atty., Richmond, Va., James E. Kilday, and Charles R. Esherick, Washington, D. C., Dept. of Justice, for defendant United States.

Robert W. Ginnane, Gen. Counsel, Samuel R. Howell, Associate Gen. Counsel, Washington, D. C., for defendant Interstate Commerce Commission.

John W. Adams, Jr., Mobile, Ala., Charles P. Reynolds, Norfolk, Va., W. A. Miller, Nashville, Tenn., Clifford T. Coomes, Louisville, Ky., Martin A. Meyer, Jr., Washington, D. C., R. B. Claytor, Roanoke, Va., R. B. Gwathmey, Wilmington, N. C., Walter C. Scott, Jr., Savannah, Ga., John S. Davenport, III Richmond, Va., for railroad intervenors, defendants and counter-claimants.

Robert N. Burchmore, Chicago, Ill., for Cramet, Inc., intervening defendant.

Before SOBELOFF, Circuit Judge, and HUTCHESON and BRYAN, District Judges.

HUTCHESON, District Judge.

Southern Railway Company, hereinafter referred to as Southern, and The Cincinnati, New Orleans and Texas Pa-

cific Railway Company, hereinafter referred to as C. N. O. & T. P., and collectively the two referred to as plaintiffs, bring this action under Sections 1336, 1398, 2284 and 2321–2325 of Title 28, U.S.C.A. and Section 1009 of Title 5, U.S.C.A., to set aside and permanently enjoin the third ordering paragraph of the order of the Interstate Commerce Commission, entered in its docket No. 31737, Cramet, Inc. v. Alabama Great Southern Railroad Co., et al., 298 I.C.C., 439, dated May 4, 1956, as amended July 6, 1956, and affirmed October 1, 1956, requiring the C. N. O. & T. P. to restore Boyce, Tennessee, to the reciprocal switching limits of Chattanooga, Tennessee.

Cramet, Inc., and certain railroads which were also defendants in the proceedings before the Interstate Commerce Commission, were permitted to intervene under the provisions of Section 2323 of Title 28, U.S.C.A. and Rule 24(a) of Federal Rules of Civil Procedure, 28 U.S. C.A., as defendants and to file their responsive pleadings.

The plaintiffs on November 16, 1956, were granted a temporary restraining order by this Court, restraining the Interstate Commerce Commission from enforcing the third ordering paragraph of the order of May 4, 1956, as affirmed by order of October 1, 1956.

Stripped of non-essentials, the issue before the Court is a narrow one and may be dealt with somewhat briefly.

Boyce, Tennessee, is what is known as an agency station in an unincorporated community, situated about 5.5 miles northeast of the Southern Railway freight station in Chattanooga, and outside the corporate limits of that city. The station house of C. N. O. & T. P., is acually within the corporate limits. The area generally is bounded by the main line of the C. N. O. & T. P. on the east, Chickamauga Creek on the north, the Tennessee River on the west and on the south by a line commencing at the river just south of the Quaker Oats plant and

running in an easterly direction to the main line of the C. N. O. & T. P. A portion of the area is in the city limits of Chattanooga. At the southeastern edge is located the modern electronic railroad yard of Southern known as Citico Yard. This yard and the main line of C. N. O. & T. P. lie between the industries served by C. N. O. & T. P. at Boyce and the main line of the N. C. & St. L.[1] from Atlanta to Chattanooga. The area is an industrial one and for more than fifty years has been served by the C. N. O. & T. P. by means of a track known as the River Track branching from the main line of the C. N. O. & T. P. and extending in a westerly direction to a point near the edge of the river. Anticipating the completion of certain dams across the Tennessee River, which would result in an increase in the value of real estate in this area for industrial purposes, Southern which controls C. N. O. & T. P. through stockholdings, acting through one of its subsidiaries, acquired a large tract of land within the area. C. N. O. & T. P. has spent considerable sums in the construction of additional trackage into the area. With the danger of damage from flood waters of the Tennessee River eliminated by the dam, the desirability of Boyce as sites for industrial plants has increased and additional industries have located there, including Cramet, Incorporated, a subsidiary of the Crane Company. Cramet, Incorporated, operates a Titanium plant which utilizes considerable quantities of rutile ore, a raw material used in the production of titanium metal, which is obtained in some quantities from this country and also from foreign countries. While there has been considerable discussion concerning the tariff on rutile ore, as will be seen freight tariffs are not involved here but we are concerned solely with reciprocal switching. Historically, the Boyce area has been within the switching limits of the City of Chattanooga, extending back as far as the beginning of the operation of the C. N. O. & T. P. into Chattanooga in 1881 and through

---

1. The Nashville, Chattanooga & St. Louis Railway.

routes and joint rates have been in effect for many years, with daily exchange between the various carriers. In 1952 Cramet, after considering numerous other sites for the location of its large plant, (one site valued at $97,000 offered to it for only $1.00, which was declined) acquired a site within the Boyce area. One of the principal reasons for the selection of the Boyce site was that rail service was limited to a single spur, being one railroad at the other site, and that site was not within the Chattanooga switching district. During negotiations regarding locating this plant, representatives of Cramet were solicited by representatives of various organizations including Southern to establish a plant at Chattanooga, it being pointed out that such site was within the Chattanooga switching district. No intimation was made concerning the possibility of any change in that regard. As a result Cramet selected the site and commenced construction of a plant, representing an investment in excess of $25,000,000. On June 23, 1954, after construction had commenced, C. N. O. & T. P. cancelled the reciprocal switching arrangements then in effect, except in instances where the rate from or to Chattanooga is different from the line-haul rate on a like shipment from or to Boyce. In reality, the rates from or to Boyce and Chattanooga are so seldom different that the effect of the action was that on competitive traffic destined to or from Boyce, C. N. O. & T. P. refused to switch. The result of this action was to deny access into Boyce of shipments over competing lines except upon condition it receive a division of the line-haul rate, and to deprive the shippers in the Boyce area of the benefit of competitive rates and service.

Several proceedings before the Interstate Commerce Commission, referred to in the pleadings, which involve tariffs were had before the Interstate Commerce Commission.

In No. 31737 Cramet alleges that the action of the plaintiff here is unjust, unreasonable and unduly prejudicial; that the action of June 23, 1954, was designed to deny the industries in the Boyce area the switching rates from and to points of interchange at Chattanooga; deprived Cramet of valuable services received from connecting railroads in violation of Sections 1 and 3 of the Act and in restraint of competition in contravention of the National Transportation Policy. The only question with which we are here concerned is the one presented by that portion of Docket No. 31737 in which the Commission found that "the refusal of the Southern to treat Boyce as a point entitled to switching service from and to Chattanooga at a switching charge, and the maintenance of a provision which results in rates and charges on traffic to or from Boyce when the line-haul routing to or from Chattanooga is over lines other than those of the defendant, higher than those applicable when the routing embraces the defendant as a line-haul carrier to or from Chattanooga, is unjust and unreasonable".

In conformity with the foregoing findings, on May 4, 1956, the Commission issued its order containing what is referred to as the third ordering paragraph reading as follows:

*"It is further ordered,* That said defendants (plaintiffs here), according as they participate in the transportation, be, and they are hereby, notified and required to establish, on or before August 10, 1956, upon not less than 30 days' notice to this Commission and to the general public by filing and posting in the manner prescribed in section 6 of the Interstate Commerce Act and thereafter to maintain and apply to the transportation of carload traffic requiring switching over the rails of the defendant Cincinnati, New Orleans and Texas Pacific Railway Company from Chattanooga, Tenn., to Boyce, Tenn., or in the reverse direction, switching charges, and provisions relating thereto, that will result in the maintenance of rates and charges, when the line-haul routing is over lines other than the defendant, that

are the same as those applicable when the routing embraces the defendant as a line-haul carrier to or from Chattanooga."

Subsequently stay orders were granted. On November 16, 1956, Southern published rates to become effective December 20, 1956, the result of which is to exclude other carriers involved from participating in traffic to Boyce because of the restriction that the rates apply over its own lines only. The tenor and effect of the findings and order of the Commission bring into focus the issues here involved. The C. N. O. & T. P. by its action of June 23, 1954, in denying competing carriers reciprocal switching services from Chattanooga to Boyce and the publication by Southern of its tariff of November 16, 1956, result in depriving shippers at Boyce of the advantages of competitive services and competitive carriers are foreclosed from participating in transporting freight to Boyce unless there is a division of the line haul rate with Southern. A restoration of the reciprocal switching arrangement in effect for many years would relieve this situation. While applicable rates have been involved in this and related proceedings, the rates themselves are not here in controversy and no useful purpose would be served by a detailed discussion of that phase of the proceedings before the Commission.

From the pleadings and exhaustive briefs of counsel, it appears that four general issues are presented for consideration: (1) what is the scope of review by the Court; (2) is the order of the Commission dated May 4, 1956, as amended by subsequent stay orders founded on sufficient findings, are the findings supported by sufficient evidence, and are the findings clear and unambig-

uous; (3) does Section 15(4) of the Interstate Commerce Act (49 U.S.C.A. § 15 (4)) have application in this case; (4) are the defendants entitled to relief on the counter-claim, and if so, what is their remedy.

■■■ The scope of review by a three-judge court is a well settled rule that can best be generalized to the effect that where the Commission's orders lie within the scope of the Commission's statutory authority and are based upon adequate findings, supported by substantial evidence, they should not be set aside, modified or disturbed by the court on review. Application of this rule to the instant case answers the second issue raised herein (supra). The Commission in affirming the amended order of May 4, 1956, thereby adopted said order. The facts were discussed in detail, the contentions of all parties were set forth and the findings of the Commission were based thereon. The ordering paragraph complained of was founded upon the findings set forth. The result (i. e., findings) of the order was implicit in the order itself and can not be labeled unclear or ambiguous merely because of disagreement therewith. The courts have been uniform in holding that they should not go behind a final administrative order and that the test is sufficient findings, supported by substantial evidence. In this instance a review of the record discloses that the findings of the Commission are adequate and supported by ample evidence and it follows that the order of May 4, 1956, was in full compliance with the rule.

■■■ The contention of Southern to the effect that the Commission by the order of May 4, 1956, would short-haul Southern contrary to Section 15(4), 49 U.S.C.A.,[2] was answered fully by the

2. Section 15(4) reads in part as follows:
"(4) In establishing any such through route the Commission shall not (except as provided in section 3, and except where one of the carriers is a water line) require any carrier by railroad, without its consent, to embrace in such route substantially less than the entire length of its railroad and of any intermediate

railroad operated in conjunction and under a common management or control therewith, which lies between the termini of such proposed through route, (a) unless such inclusion of lines would make the through route unreasonably long as compared with another practicable through route which could otherwise be established, or (b), unless the Commis-

Commission in its report at page 445.[3] The distinction between the City of Sheboygan, Wis. v. Chicago and North Western Railway Co., 227 I.C.C., 472, relied upon by Southern, and the present case is two-fold. In the instant case sufficient public interest has been shown on the record to warrant the Commission's affirmative action and such public interest was held to be lacking in the Sheboygan case. Secondly, historically, the record indicates that Boyce and Chattanooga were treated in all the tariffs identically until June 23, 1954. Thus it is to be borne in mind that the Commission is not now establishing a through route and joint rate under Section 15(3), Title 49, U.S.C.A. Upon the contrary, the action of plaintiffs, in effect, is the cancellation of an existing through route and joint rate without the consent of all carriers

party thereto or authorization by the Commission. The action on the part of plaintiffs having been suspended by the Commission for investigation, the burden is upon plaintiffs to show its action is consistent with the public interest. This they have not done. It follows that plaintiffs are not giving up any rights or privileges exercised prior to June 23, 1954.[4] It also follows that the conclusion of this Court is that plaintiffs are not short-hauled by the order of May 4, 1956, contrary to Section 15(4), Title 49, U.S.C.A.

The relief sought by defendant in the counterclaim restated simply is, the prompt compliance by plaintiffs with the orders of the Interstate Commerce Commission. Therefore the Court having held that the plaintiffs are not entitled to relief from the order of the Commis-

3. sion finds that the through route proposed to be established is needed in order to provide adequate, and more efficient or more economic, transportation: *Provided, however,* That in prescribing through routes the Commission shall, so far as is consistent with the public interest, and subject to the foregoing limitations in clauses (a) and (b), give reasonable preference to the carrier by railroad which originates the traffic. * * *."

3. The report contains the following language:

"It is the position of the Cincinnati, New Orleans & Texas Pacific that it cannot be required to perform terminal services for other lines under a switching arrangement since it would thereby be short hauled in violation of section 15(4), citing City of Sheboygan, Wis., v. Chicago & N. W. Ry. Co., 227 I.C.C. 472; Northwest Metal Products, Inc., v. C., M., St. P. & P. R. Co., 272 I.C.C. 401; and Whatcom County Traf. and Rates Bur. v. G. N. Ry. Co., 293 I.C.C. 119, among others. In those proceedings the Commission was asked to require the carriers which originated traffic to turn that traffic over to other carriers at points of origin, which would have created new routes over which the carriers on whose lines the traffic originated would have been short hauled. Here the issue is the lawfulness of a proposal by the Southern to exclude established routes from the application of reduced rates, which requires a showing that the

proposal is consistent with the public interest. There is no warrant for the maintenance to Boyce or to Chattanooga of higher rates over some than over other routes, if the cancellation of routes as proposed is not shown to be consistent with the public interest. Where the Commission is not asked to establish through routes and the cancellation of routes is not shown to be consistent with the public interest, section 15(4) has no application. See United States v. Great Northern Ry. Co., 343 U.S. 562, 72 S.Ct. 985, 96 L.Ed. 1142.

"The tariff provision designed to accomplish the removal of these industries at Boyce from the benefit of switching services from and to Chattanooga, except in stated situations, is quoted in the appendix hereto. It appears that the result thereof is the division of charges from joint rates applicable to and from Boyce other than by the absorption of a switching charge. The only condition under which the traffic will be switched at a switching charge, according to these provisions, is an absence of the same rates to or from both Boyce and Chattanooga. The evidence indicates that few, if any, rates to Boyce are not the same as those on like traffic to Chattanooga."

4. See Atchison, T. & S. F. R. Co. v. United States, 279 U.S. 768, 49 S.Ct. 494, 73 L.Ed. 947; and United States v. Great Northern Rwy. Co., 343 U.S. 562, 72 S.Ct. 985.

sion of May 4, 1956, affirmed October 1, 1956, it follows that the temporary restraining order should be annuled and that plaintiffs be ordered to comply promptly with the orders of the Commission. Plaintiffs' petition for a permanent injunction will be denied.