OMAHA GRAIN EXCHANGE, Union Pacific Railroad Company, Chicago and North Western Railway Company, Chicago, Burlington and Quincy Railroad Company, Chicago, Rock Island and Pacific Railroad Company, Atchison, Topeka and Santa Fe Railway Company, and Missouri Pacific Railroad Company, Plaintiffs,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants,
The Board of Trade of Kansas City, Missouri, Intervener.

Civ. A. No. 01065.

United States District Court
D. Nebraska.

June 21, 1961.

Harry B. Otis and R. D. Neely, Omaha, Neb., and Edgar Vanneman, Jr., Chicago, Ill., for plaintiffs.

Fritz R. Kahn, Atty., I. C. C., Washington, D. C., for defendants.

Byron M. Gray, Topeka, Kan., for intervener.

Before JOHNSEN, Circuit Judge, and ROBINSON and VAN PELT, District Judges.

VAN PELT, District Judge.

This action was brought by the Omaha Grain Exchange, the Union Pacific Railroad Company, Chicago and North Western Railway Company, Chicago, Burlington and Quincy Railroad Company, Chicago, Rock Island and Pacific Railroad Company, Atchison, Topeka and Santa Fe Railway Company, and the Missouri Pacific Railroad Company [1] to restrain enforcement of orders of the Interstate Commerce Commission. Defendants are the United States of America, pursuant to 28 U.S.C.A. § 2322, and the Interstate Commerce Commission. By order of October 5, 1960, the Board of Trade of Kansas City, Missouri, was granted leave to intervene as party defendant.

The series of events leading up to the instant action are as follows: Complaint was filed before the Commission on March 25, 1957, by the Atchison Board of Trade, the Board of Trade of Kansas City, Missouri, The Saint Joseph Grain Exchange, and Wolcott & Lincoln, Inc. alleging that grain rates from origins in Nebraska, Iowa, Kansas, and Missouri to destinations in Arizona and California when transit was taken at the lower Missouri River markets,[2] were unjust, unreasonable, and unduly prejudicial to such markets, and unduly preferential to grain interests located at other markets; that provisions in the defendants' tariffs governing transit and reconsignment constitute unjust and unreasonable regulations and practices, resulting in unjust

and unreasonable charges on the movement of such traffic; and that the failure of the Burlington and the Santa Fe railroads to establish and maintain through routes and joint rates for the transportation of grain and grain products from specific origins in Nebraska to Arizona and California via the lower Missouri River markets resulted in the exaction of unjust, unreasonable, and unduly prejudicial rates and charges. The complaint was assigned docket No. 32149 and hearing was held before an examiner with the Sioux City Grain Exchange, the Denver Grain Exchange Association and the Chicago Board of Trade, among others, intervening. The examiner issued his proposed report in April, 1958. Exceptions to the proposed report and replies thereto were filed and the issues were argued orally before Division 2 of the Commission. Its report and order were entered on December 4, 1958. The railroads requested reconsideration of findings 2 and 5 of the report. Such findings were as follows:

"2. The rates and charges on grain and grain products when originating in Nebraska on the Missouri Pacific, or on the North Western and moved in connection with the Missouri Pacific or the Burlington via the lower Missouri River markets, with transit thereat, and destined to points in Arizona and California, are unduly prejudicial to such markets and unduly preferential of Omaha to the extent that they exceed the rates and charges on the same commodities from and to the same points via Omaha, with transit thereat.

\*    \*    \*    \*    \*    \*

"5. The defendants' rules and regulations governing the inspection or reconsignment of grain and grain

---

1. The names of the railroads will hereinafter be referred to by the following abbreviations: The Atchison, Topeka & Santa Fe Railway Company (Santa Fe); Chicago, Burlington & Quincy Railroad Company (Burlington); Chicago and North Western Railway Company (North Western); Chicago, Rock Island &

Pacific Railroad Company (Rock Island); and the Missouri Pacific Railroad Company (Missouri Pacific).

2. By "lower Missouri River markets" is meant Kansas City, Missouri and Kansas; Atchison, Kansas; Leavenworth, Kansas; and Saint Joseph, Missouri.

products when originating in Nebraska on the Missouri Pacific, or on the North Western and moved in connection with the Missouri Pacific or the Burlington via the lower Missouri River markets, with inspection or reconsignment thereat, and destined to points in Arizona and California, are unjust and unreasonable to the extent that they result in charges in excess of those that would accrue on the same commodities from and to the same points over routes via Omaha, with inspection or reconsignment thereat."

The above findings differ from those recommended by the examiner in that the examiner found no unlawfulness with respect to rates on grain and grain products originating on the North Western nor did he make the distinction in findings 2 and 5 above that the rates are unduly prejudicial to the lower Missouri River markets when transit is taken thereat but that the rules governing inspection and reconsignment are unjust and unreasonable to the extent that they result in charges at the lower Missouri River markets in excess to those that would accrue on the same commodities over routes via Omaha.

The request for reconsideration was denied on May 19, 1959. The North Western and connecting railroads then filed tariffs to become effective August 10, 1959, proposing to cancel the routes on grain and grain products upon which the Commission had held the rates to be unlawful. The Missouri Pacific published an item in the Trans-Continental Tariff indicating that their rate would be no higher through Kansas City than through Omaha. The tariffs filed by

North Western and connecting railroads, were protested by The Board of Trade of Kansas City, Missouri, and were then suspended by the Commission. That case was assigned Investigation and Suspension Docket No. 7227 and hearing was held before another examiner on November 10, 1959. The Commission issued its report and order on April 6, 1960, ordering the tariffs filed by North Western and connecting railroads cancelled. Plaintiffs herein requested reconsideration of the report and order in Docket No. 7227. This was denied by order of July 21, 1960. The instant action was filed on August 10, 1960. An order was issued temporarily restraining the enforcement of the orders of the Commission in Docket Nos. 7227 and 32149. On August 14, 1960 a Three-Judge court was designated pursuant to 28 U.S.C.A. §§ 2284 and 2325 to hear the matters here involved. Hearing was held December 3, 1960.

The facts surrounding this case are elaborately set out in the reports of the Commission. Only facts that may be necessary to a general understanding of the present questions are here repeated. Eastern Nebraska (into which area the lines of the North Western extend), western Iowa, northeastern Kansas, and northwestern Missouri comprise the largest corn producing areas west of the Mississippi River. California and Arizona are deficit grain-producing areas, and most of the grains required in those states must necessarily come from the surplus producing areas to the east. At present, grain and grain products from the above-described area move on group-to-group one-factor commodity rates. The grain is generally transited at Omaha or some other transit point.[3] The

3. A transit privilege, usually called a "transit", has been explained by the Supreme Court in Board of Trade of Kansas City v. United States, 314 U.S. 534, 537-538, 62 S.Ct. 366, 368, 86 L.Ed. 432, as a privilege which "enables grain to be shipped from point A to point B, there to be stored, marketed, or processed, and later reshipped to point C at a rate less than the combination of the separate

rates from A to B and B to C * * *. The shipper pays the local rate on the inbound shipment to the transit point, B in our illustration. A receipted freight bill specifying the point of origin, the rate paid, and other pertinent data, is recorded with the transit bureau as evidence of intention of further transportation of the inbound grain or its equivalent. When the outbound shipment is

privilege of stopping grain in transit is authorized at all intermediate stations on all applicable routes. The basis of the charge is the published through rate from origin to destination via the transit point, subject to maximum pay-in rules. The effect of the pay-in rules is to require charges in addition to those resulting from the application of the through rate when the inbound rate to those markets exceeds a specified amount. The lawfulness of the pay-in rule was upheld by the Commission in its report of December 4, 1958. The Commission stated:

"The rules do have a direct relation to the service rendered by the railroads since their purpose is to discourage the movement of grain for a considerable distance in a direction opposite to the final destination. They are of uniform application in that they apply in connection with transcontinental traffic moving via all of the Missouri River markets from producing areas to the west * * *. The rules do not operate to eliminate every back haul or out-of-line movement of grain, and that is not their purpose. They are designed and published to secure additional revenue for back haul or out-of-line service which the railroads consider excessive." 305 I.C.C. 642.

Plaintiffs contend that the small movement from origins on the North Western via Omaha does not constitute competition to Kansas City by other markets; that there is no substantial evidence to support the finding that the two routes in question are unlawful but that other North Western routes and the routes by other railroads from the same origins are not unlawful; that there is no evidence to support the distinction in Findings 2 and 5 in Docket No. 32149 that the pay-in rule is unjust and unreasonable when inspection and reconsignment are taken at Kansas City but prejudicial when

transit is taken; that the order arbitrarily goes beyond the record in that the evidence concerns only a small part of Nebraska and was confined to corn; that Section 4 of the Interstate Commerce Act, 49 U.S.C.A. § 4, would be violated; that the burden of proof as to the public interest was incorrectly placed on the respondents (railroads) in Docket No. 7227; and that the public interest would be adversely affected because of various results that would flow from the Commission's findings.

The scope of the review of this Court is governed by the standards set forth in the Administrative Procedure Act. 5 U.S.C.A. § 1009.

A three-judge court in California in the case of Lang Transp. Corporation v. United States, D.C., 75 F.Supp. 915, 925, has well set forth the powers and limitations of this court.

"Certain postulates will be laid down here as a basis for the ultimate decision in this case:

"(1) It is not the province of a three judge court to weigh the evidence before the Commission; and, if the findings of the Commission are supported by the evidence, the district court should decline to substitute inferences of its own for those drawn by the Commission (Chicago, St. Paul & C. R. Co. v. United States, 1944, 322 U.S. 1, 3, 64 S.Ct. 842, 88 L.Ed. 1093; Rochester Telephone Corp. v. United States, 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147);

"(2) The report and order of the Commission will not be annulled nor enjoined by a district court unless it exceeds the statutory authority of the Commission or violates the federal constitution (Jack Cole Co. v. I. C. C., D.C., 59 F.Supp. 10, affirmed 324 U.S. 822, 887, 65 S.Ct. 680, 89 L.Ed. 1392; Watson Bros. Transp.

tendered to the carrier, the freight bill is surrendered in order that the shipper may obtain an outbound rate lower than that which he would otherwise be com-

pelled to pay. The privilege belongs, as it were, to both the grain and its shipper."

Co. v. United States, D.C., 59 F. Supp. 762);

"(3) The burden of showing such an invalidating infirmity in these challenged orders in the federal district court rests upon the plaintiffs herein suing to enjoin the report and order of April 8, 1946 (Watson Bros. Transp. Co. v. United States, supra);

\* \* \* \* \* \*

"(5) Federal Statute, 24 Stat. 379, 49 U.S.C.A. § 1, et seq., gives prima facie effect to the findings of the Interstate Commerce Commission (Meeker v. Lehigh Valley R. Co., 1915, 236 U.S. 434, 439, 35 S.Ct. 337, 59 L.Ed. 659, Ann.Cas.1916B, 691);

"(6) The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body (Rochester Telephone Corp. v. United States, 1939, 307 U.S. 125, 146, 59 S.Ct. 754, 83 L.Ed. 1147); \* \*." 75 F.Supp. 925, 926.

The United States Supreme Court has indicated that our function primarily is to determine whether, considering the record as a whole, the findings of the Commission are supported by substantial evidence. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

The reasoning behind this view and one of the best arguments in favor of it, is set forth in a case involving rates, to wit: Board of Trade v. United States, 314 U.S. 534, 62 S.Ct. 366, 86 L.Ed. 432, in which it is said:

"The process of rate making is essentially empiric. The stuff of the process is fluid and changing—the resultant of factors that must be valued as well as weighed. Congress has therefore delegated the enforcement of transportation policy to a permanent expert body and has charged it with the duty of being responsive to the dynamic character of transportation problems. Cf. Railroad Commission [of Texas] v.

Rowan & Nichols Oil Co., 310 U.S. 573, 581–582 [60 S.Ct. 1021, 1024, 84 L.Ed. 1368].

\* \* \* \* \* \*

"Neither rule of thumb, nor formula nor general principles provide a ready answer. We certainly have neither technical competence nor legal authority to pronounce upon the wisdom of the course taken by the Commission. It is not for us to tinker with so sensitive an organism as the grain rate structure only a minor phase of which is caught in the record before us. If we were to grant the relief sought by the appellants, we would be restoring evils which the exclusive rate-break adjustment was designed to remove— evils which, for all we know, would be far more serious than those complained of by the appellants." 314 U.S. at pages 546, 548, 62 S.Ct. at page 372.

■ From the foregoing it is clear that the Commission's order must be affirmed, notwithstanding our personal views of the evidence, or any decision we might render on the evidence if we were sitting in place of the Commission, unless we find either that the orders are capricious or arbitrary or contrary to statutory authority or unsupported by substantial evidence.

The court in Great Northern Ry. Co. v. United States, D.C., 81 F.Supp. 921, 925, affirmed 336 U.S. 933, 69 S.Ct. 750, 93 L.Ed. 1093, stated:

"A transit has been determined to be an essential part and universal practice in connection with the transportation of grain. Ordinarily, it seems that the establishment of transit privileges at particular points is left to the discretion of the carrier. When a carrier denies transit at an intermediate point along a through route and such denial operates in a manner that is unreasonable and unduly prejudicial, then we think the Commission, by Sections 1 and 3, and Sec-

tion 15(1), has power to correct the discrimination and order the establishment of the transit." 81 F.Supp. at page 925.

The application of the pay-in rules in the instant case is in effect a denial of transit at the lower Missouri River markets.

■■■■ Discrimination may be practiced by a combination of connecting carriers as well as by an individual railroad. Central R. R. Co. of New Jersey v. United States, 257 U.S. 247, 42 S.Ct. 80, 66 L.Ed. 217; Texas & Pac. Railway Co. v. United States, 289 U.S. 627, 53 S. Ct. 768, 77 L.Ed. 1410. As stated above, the purpose of the maximum pay-in rule is to secure additional revenue for excessive back haul or out of line service. The authorized routes here in question are direct routes involving no back haul or out of line service. The evidence established that application of the maximum pay-in rule, however, requires higher charges when transit is taken at the lower Missouri River markets than when transit is taken at Omaha. This indicates prejudice to the lower Missouri River markets and preference to Omaha. The question remains whether this situation operates in a manner that is unduly prejudicial to the lower Missouri River markets. Plaintiffs contend that the lower Missouri River markets can hardly be prejudiced because insofar as the routes in question are concerned there is no competition with Omaha, i. e. no movements via Omaha from North Western origins to California and Arizona. In Docket No. 32149 there apparently was no evidence of any such movement. There was evidence in Docket No. 7227 (page 6 of record) that such movement amounted to only about five cars a year. However, it does not appear that the study there referred to showed the total cars from origins on the North Western transited at Omaha, such as those that may have been transited on the Rock Island.

The Supreme Court in United States v. Illinois Central R. Co., 263 U.S. 515, 44 S.Ct. 189, 68 L.Ed. 417, stated:

"To bring a difference in rates within the prohibition of section 3, it must be shown that the discrimination practiced is unjust when measured by the transportation standard. In other words, the difference in rates cannot be held illegal, unless it is shown that it is not justified by the cost of the respective services, by their values, or by other transportation conditions." 263 U.S. at page 524, 44 S. Ct. at page 193.

The court believes that a finding of undue prejudice is not entirely dependent upon a showing of a large volume of movement from North Western origins via Omaha to California and Arizona. As the record indicates, competition in the grain industry is very keen. The higher charges when transit is taken at the lower Missouri River markets are not justified by cost of the respective services. Presumably these markets could successfully bid for grain produced in the area in question if it were not for the increased charge which results from application of the pay-in role. We think, therefore, that the record as a whole substantially supports the finding of undue prejudice to the lower Missouri River markets. Likewise the record substantially supports the finding of unreasonableness when inspection and reconsignment are taken, even though rates which are unduly prejudicial may be reasonable. Interstate Commerce Commission v. Inlands Waterways Corporation, 319 U.S. 671, 63 S.Ct. 1296, 87 L.Ed. 1655. It is not necessary, therefore, that the Commission set forth the reasons for the distinction in Findings 2 and 5 in Docket No. 32149. The court also believes there is substantial evidence in the record to support the order insofar as it applies to grain and grain products and not just to corn as contended by the plaintiffs (pages 64, 68 of the record).

■■■ It is contended that the order goes beyond the origin area complained of by the lower Missouri River markets, in that the order pertains to the entire State of Nebraska whereas the origin

area complained of was limited by the complainants as shown on pages 23, 191 and 229 of the record. In considering this contention it should be kept in mind that the Interstate Commerce Commission is responsible for the enforcement of a highly sensitive and complex grain rate structure. In carrying out this responsibility it is necessary for the Commission, when considering the scope in area of its orders, to consider the future effect of an order upon the entire grain rate structure. The court believes, therefore, that in light of the evidence the conclusions of the Commission as to the scope in area of its order is not arbitrary and should not be disturbed by this court.

■ The argument of the carriers that the order is invalid because it violates Section 4 of the Act, does not present sufficient reason for non-compliance with the order. See Beaumont, S. L. & W. Ry. Co. v. Magnolia Provision Co., 5 Cir., 26 F.2d 72. Section 4 provides a method by which a carrier may in some cases obtain relief from the operation of the long and short haul provisions.

■■ The Commission stated in its report in Docket No. 7227 "that the respondents have not shown that cancellation of the routes in issue would be in the public interest."

49 U.S.C.A. § 15(3) provides in part as follows:

"If any tariff or schedule canceling any through route or joint rate, fare, charge, or classification, without the consent of all carriers parties thereto or authorization by the Commission, is suspended by the Commission for investigation, the burden of proof shall be upon the carrier or carriers proposing such cancelation to show that it is consistent with the public interest, without regard to the provisions of paragraph (4) of this section."

All carriers that were parties to the proceedings gave consent to the cancellation. The question, therefore, arises whether it is to be inferred from Section 15(3), Title 49 U.S.C.A. that the carriers do not have the burden of proof when all carriers parties thereto have consented to the cancellation. In light of the purpose of the Act, once it is established that it is within the public interest to have a particular route, the court believes that those seeking a change should have the burden of showing that the change is consistent with the public interest. The carriers should not be able to shift the burden of proof by merely consenting to a change. It would therefore be inconsistent with the policy of the Act to construe Section 15(3) as implying that the carriers do not have the burden of proof as to public interest when all carriers have consented to the cancellation, except as the situation also is one in which the Commission itself has authorized such a cancellation. The court concludes, therefore, that the burden of proof as to public interest was correctly placed upon the carrier in the cancellation proceeding.

For the reasons above stated the orders of the Commission must be affirmed.

An appropriate order will be entered.